Good morning, everyone. Good morning, Judge Rovnar. Good morning. Good morning. Our first case is number 233196, Kilborn v. Amiridis. Mr. Sullivan. Thank you, Your Honor. It may be difficult to hear on a motion to dismiss that was granted, and I want to start with the First Amendment retaliation claim and specifically the matter of public concern issue because the decision on that claim turns on whether any of the four instances of speech for which Professor Kilborn was disciplined involved a matter of public concern under that well-established principle. And here, all of the speech is eligible for First Amendment protection, so this case, the dismissal can't stand, and this case needs to go back for a full treatment under the Pickering two-step balancing test, where in step two, the state's against the professor's interest in the speech that's at issue. I think a good way to talk about it today is that there's four instances of speech that are relevant, and two were in classrooms to stand up teaching speech, and the others were out of class public commentary about a controversy about the exam question that was issued. So I wanted to just start with the in-class substantive teaching speech, and that relates to matters of public concern on multiple levels, starting with the specific content of what Professor Kilborn was saying in writing in the exam, and also orally during the lecture. The specific content related to matters of public concern, the exam question, which presented a scenario where a lawyer is confronted with his own client's evidence about his own client having a meeting using a racial epithet, and how to deal with that in a discrimination case. And in presenting that hypothetical, as Professor Kilborn had done for years, he made a choice to confront the students with a real-life scenario that involves this horrible word, and the epithet. And whether teaching speech at the university level should use that word, expurgated or otherwise, even in a hypothetical, was itself a matter of public concern. It was at the time. And Professor Kilborn, using his expertise as the law professor, he chose to present that hypothetical to future lawyers. The course is Civil Procedure II, right? Correct, Your Honor. What does the epithet add to the civil procedure lesson? Well, the lawyers were being confronted with an issue of work product and discovery. And so a lawyer getting this horrible evidence needs to make a decision of what am I going to do with it during discovery. And most issues of discovery like that are very easy. This one would be very hard and controversial, frankly. So he chose that purposely to confront these future lawyers with a real-life scenario that would inherently be uncomfortable to them. Could I ask Judge Hamilton's question a little bit different? If the class, if the word was used in a history class, which was discussing American slavery or something like that, versus a calculus test class in college, forget law school, okay, is there a difference under the First Amendment? I don't think so, because at least at the university level. In other words, is there any limiting principle? Or can professors say whatever they want about whatever they want during a class and it's protected by the First Amendment? I think that the limiting principle that's most important here is, is it substantive teaching speech? And then it should be protected. Well, if I understand your argument correctly, and I want to make sure I do, you're talking only about step one. Is it potentially protected speech? I assume that if we confront you with outrageous hypotheticals, and I've thought of a lot, and I'm sure everybody else has too, about what a professor might teach or insist be the right answer on an exam, that the university would have plenty of rights at the second step, the balancing step, to say this is outrageous and you can't teach this in this university. Yes. And when you do, it wasn't done here. I don't know if that's helpful for Judge Kirsch's question to separate steps one and two. Right. But at step two, the state's interest will, of course, and depending on how it was used in different contexts, calculus, history, law, you have the professor's strong interest generally in substantive teaching. It's the academic freedom principles apply there on this side, but that will be a relative thing, perhaps, depending on the class. On the other side, of course, the state's interest will be context-specific as well. That balancing hasn't been done here. It can be done on remand. It's hard. They can have their position. Go ahead, Judge Roper. Go ahead. You finish your train of thought, and then I do have a question. No, no. No, you go ahead, please. Thank you. Thank you. Mr. Sullen, would a determination that Garcetti has an exception for academic teaching and scholarship, at least on the university level, conflict with any prior decision of this court? No, Your Honor. I might get the words wrong. Redner and Wozniak, and there are several decisions. There's a footnote, maybe footnote 23 in Heim from the Second Circuit last year that tallies those cases and discusses them. It says the Seventh Circuit had a little bit different approach about Garcetti, but all of those cases, there's one about administrative corruption about grants. Of course, in the Wozniak case, the professor was calling his students into his office and berating them for not giving him the teaching award. None of that is substantive teaching, and there aren't any cases, frankly, applying Garcetti to true substantive teaching content, like the exam in the lecture hall here. So if it's substantive, then I think that at step one, the protection should be eligible. At step two, you get the balancing of the state's interest in that. We don't have it here, though, because I don't think they argued that. No, they put it in their brief, but it wasn't raised below, and it's not before this court. Which is an issue, right? Because how do we draw the line on step one? If we kick everything to step two, I guess maybe they can argue that if it's remanded, I don't know. Right. Well, on remand, they can raise their interest. But here, of course, the matter of public concern, it is a standard, and it needs to be applied. Can I follow up on what Judge Rovner asked, on the qualified immunity question? What's the best case that you have to say? We've got very little analysis on this issue. I think the Ninth Circuit said there was no qualified immunity in a similar, or there was immunity in a similar context, and I can't remember if it was the second or the sixth, said the fourth, I can't remember. There was no qualified immunity. In a paragraph, they said our pre-Garcetti case law was clear, and Garcetti didn't change anything in this context. What's the best case that you have for no qualified immunity here? So, we tallied them in the brief, so I might not get it right. But I think Keishian, from the Supreme Court a long time ago, and Sweezy, both involved teaching speech, and that was ideological tests being applied to teaching speech, which effectively is what you have here. In this court, there's Meade, which was the community college teacher who wrote the letter about the community college teaching, and there's another one that's in our brief. Now, the problem with Keishian and Sweezy and reliance upon them to resolve qualified immunity is that there's such a high level of generality, and particularly, well, we wouldn't even get to the question of qualified immunity until after we got through a lot of case-specific balancing, right? It would have to be evident to a reasonable university administrator in the situation how that balancing would have come out, right? Yes, Your Honor. I mean, part of the point we made in our brief is that the qualified immunity issue on all these claims is premature at the motion-to-dismiss stage, because what's the right precedent and trying to resolve the issue? It was addressed by both the Fourth and the Ninth Circuits when they had different outcomes about qualified immunity. Would you agree that if this case was reversed on the speech issue, the qualified immunity question would be perhaps different as to each statement that the professor made? In other words, there may be a different qualified immunity analysis as to the in-class discussion versus the Zoom call or the meeting with students. Right. I think the exam and the classroom are one category, and the email and the Zoom are another category, and yes, I think that qualified immunity would be different for those. I'd like to take you, well, all right. As to the claim of compelled speech, have you sought any prospective relief? Your Honor, we have not appealed the determination that he's not eligible for prospective relief on the compelled speech based on a threat of having to do the training a second time. That might be an open issue, but we're not arguing it here. The compelled speech does rise on the damages claim in the qualified immunity question. Our point there is that it's not ideology-specific, these precedents. It doesn't matter what ideology the government is forcing on someone through compelled speech. It's clear that you can't do it, and it has been so for a long time. Yeah. You see, what I am interested in was that as to the personal capacity claims of compelled speech, I wondered what your view was on what clearly established law would have apprised the that diversity training could constitute compelled speech. Yes. They told him that he had to give his commitment to the goals, that he had to agree with what they were teaching him, and that's an ideological component there. In the precedents, there are various ideologies. Of course, this stemmed after World War II with communism and things like that. Here, it's clear. It's a clearly established basic First Amendment principle that doesn't require a precedent on this specific form of ideology in compelled speech. That's our position. Are you familiar with the Eighth Circuit's decision in Henderson last week? No, Your Honor. I apologize. It does not involve university, but it does involve public employees objecting to diversity, equity, and inclusion training. There, the court wound up saying that they hadn't actually suffered harm. I can't remember if it was that opinion or Haim that said, in essence, an employer can require this sort of training and can insist that an employee, in essence, give the correct answer to show that they understand the training, whether they agree with it or not. Your Honor, I'm sorry. I haven't read it, so I'm not answering the question. That's fine. While we're on the question of the compelled speech claim, it does seem pretty common these days for lots of public and private employers to provide and compel such training, right? Yes, I think that's fair. Are we talking here about any special treatment for Professor Kilbourn because he's a professor, or does your argument reach any of these kinds of training for any public employees? It's not just because he's a professor, but the important part of the compelled speech is the part of the training that was compelled speech, which is that he had to write these self-assessment essays and have the individual sessions with the explicit requirement that he express his commitment to the goals. Otherwise, he wouldn't teach again, and he is teaching again, so he did what he had to do. That's the distinction between sitting through a training. You can have the training without the compelled speech. Could I follow up also on the Garcetti question? Under your approach, who would be protected? The university-level professors are protected. Full professor, tenured or untenured, part-time or full-time? Yes. All of those? I think so, yes. TAs? Yes. Okay, but not going down to high school level? Right. I think the law of applying in high school is different. Here, we're, of course, at the graduate highest level. There are lots of issues. I would like to reserve a little time for rebuttal. Thank you. Mr. Kennedy. Good morning, Your Honors. Good morning, Judge Rodner. John Kennedy on behalf of the five individual defendants who have been sued in their official and individual capacities. It's our view, Judge, that the district court was correct in finding that Professor Kilbourn failed to state a cause of action under Rule 12b-6 and also applied correctly the qualified immunity doctrine to the compelled speech claim. In addition, Kilbourn cannot prevail on additional issues. For example, if the qualified immunity claim reaches the substantive claims that had been dismissed under Rule 12b-6, Professor Kilbourn cannot survive the qualified immunity bar. He has cited no cases from the Supreme Court or this circuit that would put the individual school administrators on notice that the law was clearly established at the time they required Professor Kilbourn to attend diversity training. Mr. Kennedy, I would very much appreciate if you would give me a yes or no on my first question, and then I have a couple of follow-ups. Would you acknowledge that the Supreme Court has recognized that protection of academic freedom is a special concern of the First Amendment? Is it just yes or no? Yes. Isn't the free exchange of ideas on campuses essential to creating informed citizens? As a general proposition, Your Honor, yes. You know, who are capable of critical thinking, and you'd agree, I take it, that that is a central concern of the First Amendment. I would agree with that, Your Honor. If so, how could Garcetti apply to academic speech without eviscerating that purpose? Garcetti, to frame the issue, if I may, Garcetti was issued in 2006. Contrary to my colleague's argument that once you establish that the professor's speech is academic, it automatically reverts to the Pickering balancing test. That's not how we read the case law. The case law is multi-step. It's not necessarily an even flowchart, but the flowchart is this, as I understand it. First, does the speech of the professor, and let's cloak it with academic speech, does the speech of the professor rise to the level of a public concern? Academic speech under Justice Souter's dissent and of the other circuits, academic speech still must satisfy the public concern requirement. Then the next question is, does the speech, assuming it's a matter of public concern, rise to the level of academic or scholarly speech? Then the next question is, is the professor acting within his official duties? The exception to the official duties framework would only take place after various boxes are checked. Public concern, one, it is academic and scholarly speech, two, and three, the person is acting within his official duties as a professor. Here, Professor Kilbourn, according to district court, failed to establish the first burden, and that is the use of the N-word, the use of cockroach, the use of... What if we disagreed with the district court on that point? If the court finds... Where do we go? Where do you win? Here's where you go, Judge. Thank you. If the court finds that the words at issue rise to the level of public concern and the words at issue are academic and scholarly speech, you have two roads. You can pivot and say, we're going to apply the exception to the official duties framework, which I think is way too soon. And the reason for that is the alternative path is the correct path, and that is it doesn't matter because qualified immunity bars these claims. The defendants were not on notice of the law that was beyond debate, which is the standard, for them to clearly establish that constitutional right was being violated. So the path to... I'm sorry, Judge. No, go ahead. I finished your thought. The point is the path here is in affirming the judgment below never reaches the so-called exception, because qualified immunity, assuming that rule 12b-6 decision is reversed, qualified immunity nevertheless instructs that this judgment should be affirmed on that alternative ground. Plaintiff has... I'm sorry. Given the complexity and the fact dependence of so many of the issues that were raised in this case, how could dismissal at this initial stage be appropriate? I mean, aren't constitutional and qualified immunity issues such as those presented here more properly left for the summary judgment stage? Two points on that, Judge. And the district court observed this. In this case, we have a very full record. In the initial complaint, we had the First Amendment complaint, and in the Second Amendment complaint, Kilbourn clarified precisely what speech he relied upon for his argument that he was being retaliated against. And the district court observed in paragraph 57 of the Second Amendment complaint, there are four buckets of alleged protected speech. Two words in the classroom, lynching and cockroach, a word on an exam, the n-word, and then conversations he had with students after the exam. Nothing will change with a remand to the district court and summary judgment. Those facts are fixed. That speech is concrete, and qualified immunity based upon the relief he seeks in the case squarely applies. But if I thought, for instance, okay, the cockroach comment, that the full transcript doesn't, to me, certainly appear to support your characterization of that particular comment. And I mean, yeah. I can respond to that if you'd like, Judge. Sure. You know, the defendants take the facts as alleged as true. And with respect, for example, to the cockroach word, the allegations in the record establish, first, that Professor Kilbourn was using the word cockroach in the context of a, what he would claim to be, a lecture on frivolous litigation. Students, according to the record, in the Office of Access and Equity Report, complained that they believed he was using the word cockroach to apply to racial minorities. They investigated that, and they found he did not use it in that context. That word and that history of the word, as it progressed through the investigation, is clear. Those facts are framed in this Second Amendment complaint. He attaches, Kilbourn attaches, the documents that the defendants created with respect to their investigation and their findings to the Second Amendment complaint. So I would, I would suggest to Your Honor that dismissal and remand does not advance the issues in this case. The issues in this case are right. In your view, how should the exam question have been framed in this case that would assure that it did not violate the harassment policy, given the horrific, and I, well, I don't have to tell you, but how horrific, the horrific facts in cases that courts must decide regularly. How can a law professor effectively teach if using the first letter of offensive words in cases, in real cases, in things that have occurred, in things that may be ongoing, how can that be considered harassment? If you could help me with that, I'd be very appreciative. I'll do my best, Judge. First, the use of the word in the exam has never been objected to by the defendants or the university. This is not an academic freedom case. The anti-harassment finding did not arise as a result of the use of the word in the exam. It arose from Professor Kilbourn's response to the students who are criticizing him. He, according to the findings of the Office of Access and Equity, had created a racially hostile learning environment by the way he was interacting with students and talking about this issue. And the diversity training was designed to help him understand the impact his words have on their students and how better to speak about these very important issues with the student body and in the classroom. He has never... But wasn't it those two words or letters of words that started this entire situation? That is correct, Judge. According to the Second Amendment complaint, the exam controversy started the controversy, but the controversy was there was a student reaction, and this is in the record... Mr. Kennedy, it sounds like that's a good jury argument to me. You might be right in front of... What we've got is a district court opinion that says, basically, there is no academic exception, which would, I think, create a circuit split if we affirmed on that ground, because I think every circuit to address the issue has held that there's an academic exception, I think. In this case, Judge, I would beg to differ. It's not a jury question when we accept all of the facts as true. We're not contesting the allegations that he's made. We're accepting it as true. And the allegations that he's made and he's put at issue in the Second Amendment complaint, which trump contrary allegations under this court's South Bend case, all of the allegations show that it was his behavior that the Office of Access and Equity was addressing. And it said, the way you're treating these students lacked the essential respect. That's what this case is about. They never once... And he does not allege. That's just not... Your point is that's just not what the district court decided the case on, but we can decide it on that. In other words, we can go beyond what the district court did and find the academic exception applies, but that the plaintiff loses the retaliation claim on another ground. On qualified immunity grounds. But that's not what you're arguing here. You're not arguing qualified immunity. Oh, we are arguing qualified immunity. I know you are now, but that doesn't sound to me like what you're arguing to us right now, that it's qualified immunity. You're saying that he wasn't fired because he used the word. He was fired for other... I mean, he wasn't fired. He was suspended without... With pay, I think. To be clear, I was attempting to respond to Judge Robner's question as to whether or not the N word was the predicate for the finding that Professor Kilbourn harassed students. And the record is clear, that's not the predicate. The predicate was his behavior and the way he communicated with the students. Our argument back to square one is that even if the court were sympathetic to the notion that this is academic speech, it never need reach that issue because under well-established qualified immunity case law, the plaintiff has the burden to identify clearly established precedent that puts the defendants on notice beyond that debate that their action violated his rights. Yeah, we would... Go ahead, Judge Robner, go ahead. I just want to... Thank you. I just wanted to go back to my question because I don't think that I got a response as to how the exam question should have been framed in this case. So that it would never have violated the harassment policy. It's my best answer, Judge, I'll do my best. The exam question has not been the issue for defendants. You know, you keep saying that and yet it's what started everything, okay? So it has to be one. It has to be the start of the issue. I agree in terms of the chronology of the account, it's the start of the issues. Nothing happened until after the exam question was done. What happened to that? What happened was there was the Black Law Student Association organized and drew a petition to have Professor Kilbourn disciplined or terminated. And he then engaged with the law community, the law student community. And to use a vernacular, he didn't read the room and he offended people on the trying to defend himself. That's the issue that has been addressed by the administration and the defendants in this case. They have never once, and he doesn't allege, this is really important, Judge, for our point, they have never once, and he's never alleged, he can't use that exam question. He used it for 10 years by his own account, without dispute, and he's been free to use it ever since. So the question from the defendant's perspective is not the exam question, it was his response to it. And the student uproar regarding it. And he can use that question, is that right, as framed and not have anything to worry about? Yes, Judge. And if you look at the record, Judge, the July 2nd letter attached to the Second Amendment complaint, it's a letter that's signed by Professor Kilbourn and the interim dean at the time, where they talked about the potential for diversity training. And he agreed, I will undertake diversity training if, and then there was a series of steps prescribed in that letter as to when, if ever he may need diversity training. That commitment to diversity training is part of his record. He attached that to his complaint. And Judge, if you fast forward then to November, the university was dealing with still controversy on the campus. Professor Kilbourn was still an issue with the Black Law Student Association and other students. And the dean at the time wrote, and in the letter it's attached to his complaint, the situation on the campus is still fraught. I have considered the matter and I now require you to take diversity training immediately. And that was a decision in the record, placed in the record by the plaintiff. This is not a situation for discovery. It's already here. So the defendant's response was not to the N word in the exam question. It was a response to the controversy his conduct caused on campus. And the remedy, as was brought out in the initial argument, was something that's uniformly done by employers. Get some training. Learn how to talk about these issues. Can I ask you a question about the training and the compelled speech? Do we have enough on this record to decide the issue of qualified immunity? And I'm not suggesting that qualified immunity may not apply as to that particular issue. But what we've got here is clearly more than training. You know, we've got written self-assessments. Is that something that needs some development in the district court before deciding whether or not, you know, you've got an issue of qualified immunity? My answer to that is no, Judge, for two reasons. One, contrary to my colleague's argument to the court where he said it was explicit that before Professor Kilbourne could get back into the classroom, he had to agree to the goals of this diversity training. Explicit. That was the word he used. In paragraph 50 of his complaint, which controls. He doesn't say he was required to make any commitment to the goals. He alleges that the trainer would provide feedback to the university. But isn't that enough under the notice pleading standard? I mean, we're here on a motion to dismiss. That seems to be slicing the cheese pretty thin. Well, that's what the district court, I think, felt, if I can use the cheese analogy. But the district court also said, fine, you may have stated a cause of action. You didn't plead it. But I'll take the inferential leap and I'll give that to you. Then the district court said, doesn't matter, time out. You still have failed to identify clearly established case law that tells the defendants you are violating this person's rights by requiring him to attend diversity training. Well, attending is different, though, than compelling particular speech. And at least Janice is at least close. I mean, it is at least close. Their best case is a 1943 case dealing with the saluting of the flag. And then they talk about a case about license plates and how you're free to reject license plates with a political message. This complaint, this is his third complaint, Your Honor, his third. He doesn't say one word about what speech I was compelled to say that I didn't agree with. Not once in three tries. And he stands on this complaint. He never once went back to the district court and said, I'd like to replead. He doesn't even ask this court to find that the district court abused her discretion in dismissing the case with prejudice. He's standing on these facts. So it's not plausible, in our view, that he stated a cause of action for some compelled ideological speech. But even if that's the inference that the court accepts, he can't cite a single case where an employer, in the employment context, requires an employee to undergo diversity training. I understand. Just one more. Sorry. Excuse me, if I could ask a couple of questions here. On the compelled speech, I understand there doesn't seem to be any ongoing threat. No question of injunctive relief. And so it's only damages, qualified immunity may apply. On the classroom speech and the follow-up, I understand your qualified immunity argument,  But I understood there also to be a question of injunctive and declaratory relief at issue there. Well, we don't believe so. The declaratory relief, as alleged in the papers, looks to past conduct, to essentially declare I did everything OK and fix that, make that declaration, contrary to what the record shows. He presumably doesn't want to get suspended again, right? Well, that goes to his argument is that he's self-censored. He claims he is self-censored. Kilbourn claims he's self-censored because of this fear, hypothetical fear, that he's going to be, in his words, punished again. And First Amendment jurisprudence recognizes that. It doesn't if, and this is a line drawing analysis, the Capehart case is from this circuit. And in Capehart, we had a professor who made the same argument, a professor who had experienced a remedy from the employer and tried to seek injunctive relief on the claim that there was a fear of future punishment. And the court said, that's not enough. You may have a claim, but it's not ripe yet. If the employer does something, you can always come back to court. But it's too hypothetical. He's already been disciplined and kept out of the classroom for what, two or three semesters? He was kept out of the classroom for two semesters.  And then if I could also follow up, I guess, to echo what I at least heard in one of Judge Rovner's questions. It's hard for me to see how law school is a, quote, safe space in the language of our current culture. How do you teach evidence, for example, without teaching rules 412 through 415 about sexual assaults? How do you teach employment discrimination? We could go on and on and on. Law school and legal institutions deal with really hard, sensitive problems that evoke strong emotions. And the essence of what we try to do in law schools and what we try to do in courts is manage all that. And I guess I'm having trouble understanding just how sensitive deans need to be. Just how sensitive? How sensitive deans need to be in protecting students from feeling uncomfortable with some of these subjects. And if I may respond to that, Your Honor? Please. I don't think it's a question of protecting students from being uncomfortable. I think it's ensuring that the professors are properly equipped with the skill set necessary to be able to talk about these very important issues without offense or disrespect, intentional or inadvertent. That's the point. The law school, as we all know, involves some of the most difficult issues and some of the most polarizing issues, including race. And if you're going to talk about race, you better learn how to talk about race. And the administration had every right as the employer to expect Kilbourn to know how to talk about race. If he's going to wade into that issue in a civil procedure class. Well, then let's look at this. The claim that the non-discrimination policy is void for vagueness. Professor Kilbourn argued that UIC has declared that the term harassment discrimination is broader than the legal definition, but UIC hasn't defined it. I mean, are you sending the professors into some sort of wilderness? How can that claim, for instance, be developed on a motion to dismiss? I mean, shouldn't he be able to develop evidences? As to how that term is being interpreted and whether its meaning is even ascertainable. Well, if I may judge. It doesn't matter how many hypotheticals you may come up with to determine, is this harassment or is that harassment? The question ultimately becomes, regardless of whether there's a motion to dismiss granted, is the term harassment or harass in a workplace civil context so clearly vague, beyond debate vague, as to put the defendants on notice that it clearly established the constitutional right of Kilbourn has been violated. What's the state of the law? The Supreme Court and this circuit has never found a civil harassment policy as here to be void for vague. Never. And in the criminal context, which has a heightened level of scrutiny to determine what harassment means because a liberty interest is at stake, the federal anti-stalking statute uses the word harass. Eight circuit courts of appeals have held in the criminal context with a much sharper lens that that statute is not void for vagueness. Harassment is sufficiently defined to put criminal activity, to put people on notice of what's criminal. Here, with a different lens, a more accommodating lens to the employers, where this harassment policy is not unique, the court itself, as we point out in our papers, has essentially the same anti-harassment policy. It's clearly sufficient to put a reasonable person of ordinary intelligence on notice as to what's within its parameters and what is not. And he can't cite a case under qualified immunity. To the contrary, accepting all of his facts is true. And that's why the court should affirm the judgment below. As much as there may be a temptation to send it back, sending it back is not going to produce more fruit. It's just going to make the current fruit stale. It's ripe for ruling now. Sorry about the extended allegory. It's harvest season. Judge Roldner, do you have any other questions? No, but I want to thank Mr. Kennedy for being so patient and for... I've got plenty of time, Judge. Thank you, Mr. Kennedy. Thank you, Mr. Sullivan. I don't think any lawyer ever complains about going over time and arguing. I want to go back to the state of the record in the findings letter and the attachments to the Second Amendment complaint. Of course, by attaching the letters to the complaint, we aren't vouching for their content. A lot of it's disputed. But in the OAE findings letter that's part of the exhibits to the complaint, on page two of the letter, they start talking that the evidence reviewed substantiates conduct being harassment. And they quite clearly point out that the use of the exam question during the spring 2020 semester and December 2020, including the abbreviated racial epithet, was part of the harassing conduct that was substantiated. And our complaint goes through the steps of the discipline and how that all stems from this. The words in the classroom, cockroaches and lynching, are also in that findings letter as being part of the harassment. And those are a little different in how it played out because there was the public controversy about the exam that came up right away. And that in the other part of our speech claim, Professor Kilbourn is talking to people who weren't even in his class about that controversy, clearly a matter of public concern. But the cockroaches and their claim that it related to minorities isn't true, and that's why we put the transcript of the class there. And that wasn't even an issue until they made it an issue with this false finding in the letter. And what he was really doing in the classroom, as alleged and established under public concern law, is presenting scenarios in the third person, a company director who's angry about media reports and this frivolous litigation and how future lawyers are dealing with this client or that client. The Jay-Z song is a client with a racial profiled traffic stop. And his choice of specific words don't entitle them to put the OAE in the back room putting up the red sign, the stop sign, for individual words. You look at the whole content, substantive teaching content here, and it gets the First Amendment protection. It's step one of Pickering. The other claims, except for the compelled speech, we do have official capacity, declaratory injunctive relief available. The district court agreed. This is on his permanent record, and it makes a difference. And if their declaration of violation and disciplining of him and putting it in his record violated the First Amendment or due process, then he's entitled to an expungement of that. Also, as well, their claim that he can use this exam question today is clearly inconsistent with the complaint, which points out how they made a finding that it was harassing conduct. If he does it again, he's going to be disciplined again. Maybe they won't discipline him this time. We don't know. But he's subject to that. And injunctive relief on that and the other issues in play here is clearly available. He has standing for it. And that'll have to be decided down the road on remand. Your Honor, did you have a question? The out-of-class speech, let me just touch on that briefly, just to be clear that he's engaged in public commentary with people who weren't his students about a controversy about the exam question that had come. That clearly is speech of public concern. We also think it wasn't part of his official duties. Unlike Wozniak, where he's in the office hours yelling at the class students, he's doing this voluntarily on his own. And then just my very last point on the vagueness is that this policy, the harassment, one-word harassment policy, it's a university speech code as applied by the OAE. It doesn't have any touchstone in discrimination law or other definitions of harassment. It's a different word as written in that policy. And university speech codes need to be looked at differently than workplace conduct sexual harassment law. Could I trouble you for just a moment, Mr. Sullivan, about the email and the Zoom meeting with the students that followed up? As you know, we were supposed to look to content, form, and context. And my understanding was that the district judge was focused primarily on the one-on-one nature of those conversations. Tell me if I'm right, but I understand your argument to be that that actually is a little were going to be leaders in the public and had been and were going to be leaders in the public discussion of the whole issue. The Zoom conference with the representative of BALSA was clearly that.  He had a personal one-on-one relationship with his former student that was the emails. OK. But he's doing the same thing, where they're debating the proper use of these words in class, which was a matter, it's always a matter of public concern. And it was very big, you know, specific matter of public concern at the time. So the fact that it's one-on-one really isn't relevant here. And there's plenty of cases showing that. Thank you. Thank you, Mr. Sullivan. Thank you. Thank you to both counsel. The case will be taken under advisement.